**UNITED STATES of America**

v.

**Jeffrey SHIELDS, Respondent.**

**Civil No. 07–12056–PBS.**

United States District Court,
D. Massachusetts.

Feb. 12, 2009.

Jennifer C. Boal, Timothy Q. Feeley, Mark J. Grady, Eve A. Piemonte–Stacey, Mark T. Quinlivan, Jennifer A. Serafyn, United States Attorney's Office, Boston MA, for Petitioner.

Page Kelley, Judith H. Mizner, Federal Defenders, John G. Swomley, Swomley & Associates, Boston, MA, for Respondent.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW AND ORDER

SARIS, District Judge.

### I. INTRODUCTION

The United States seeks to civilly commit Respondent Jeffrey Shields ("Shields") as a "sexually dangerous person" under Section 302(4) of the recently enacted Adam Walsh Child Protection and Safety Act of 2006, Pub. L. No. 109–248, Title 111, § 302(4), 120 Stat. 587, 620–22 (2006), codified at 18 U.S.C. § 4247–4248 ("the Act"). A ten-day trial with an advisory jury was held beginning on September 3, 2008.

Three expert witnesses—each licensed clinical psychologists—testified at the trial. The court-appointed expert, Joseph J. Plaud, Ph.D., was the first witness; both sides agreed on his appointment pursuant to 18 U.S.C. § 4247. Niklos Tomich, Psy. D., testified as the government's expert witness, and Craig B. Rypma, Ph.D., testified for Mr. Shields.[1] Both Dr. Plaud and Dr. Tomich testified that, in their opinion, Mr. Shields met the statutory definition of a "sexually dangerous person"; Dr. Rypma, however, concluded that Mr. Shields was not a "sexually dangerous person" as defined by the Act.

The Court also heard testimony from five additional witnesses called by Mr. Shields: (1) Dawn Graney, Psy.D., Mental Health Program's Coordinator and clinical psychologist at the Federal Correctional Institution at Butner, North Carolina; (2) Melissa Raenae Moore, a case manager at a federal halfway house (Pharos House) in Portland, Maine; (3) Daniel Kelly, a federal probation officer in Maine; (4) Stephen P. Thomas, a clinical social worker who, via contract with the federal government, would provide sex offender treatment to Shields if he were released to reside in the Portland area; and (5) Kelly Gorham, a police detective in Portland, Maine responsible for registering, monitoring, and maintaining the city's sex offender registry.

After a review of the evidence, the jury concluded that Mr. Shields suffered from a serious mental illness, abnormality or disorder, but did not reach a unanimous decision as to whether Shields would have serious difficulty in refraining from future acts of child molestation if released into the community. Because the statute requires this Court to make the ultimate determination of sexual dangerousness after an evidentiary hearing, see 18 U.S.C. § 4248(d), I make the following findings of fact and conclusions of law.

### II. FINDINGS OF FACT

#### A. Personal History[2]

Respondent Shields, born on September 16, 1961, had a troubled background.

---

1. Having reviewed the curricula vitae of Drs. Plaud, Rypma, and Tomich and having heard their testimony, this Court finds that all three are qualified to offer expert testimony in this matter both with respect to a diagnosis of Mr. Shields and the question of whether Shields would have serious difficulty refraining from further acts of child molestation if released. (See Exs. 1, 2, 3.) In a previous motion, Respondent challenged the qualifications of Dr. Tomich to testify. This Court held that Dr.

Tomich was qualified to testify about his own assessment of Mr. Shields and the assessment tools that he utilized, but that he was not qualified to testify about statistical matters. See United States v. Shields, No. 07–12056, 2008 WL 544940, at *1 (D.Mass. Feb. 26, 2008).

2. This section is, for the most part, derived from the trial testimony of Drs. Graney and Rypma, based on reporting by Mr. Shields.

When Shields was about seven years old, his parents divorced and his father abandoned the family. Around the same time, Shields was repeatedly sexually assaulted and raped by two teenage boys who lived in his neighborhood and, eventually, by several of their friends. At age eleven, he moved in with his maternal grandmother, where he reports that his fifteen-year-old cousin abused him as well. At age thirteen, while living with his grandparents, he walked into the house one day and saw his grandfather commit suicide by shooting himself in the head. After his grandfather's death, Shields began drifting from one relative to another, eventually dropping out of high school, becoming homeless, and abusing alcohol and drugs. To make money, Shields began working as a prostitute in Florida by the age of thirteen. Mr. Shields has had numerous consensual adult sexual relationships, though he has described these relationships as primarily superficial and sexual in nature and has stated that while he has tried being in more committed relationships, he did not find them fulfilling and often wanted to push away partners who attempted to show him affection. (Ex. 103 (10/27/05, 3/24/05, and 5/16/06 treatment notes).)

Mr. Shields has a history of depression and has engaged in some sort of mental health counseling since the age of seven. (Trial Tr. Day 6, 70 (Graney).) Mr. Shields also reported having made several suicide attempts in his life, with the last one in 1999. (Ex. 103 (8/2/04 intake summary and 8/19/04 treatment notes).)

## B. Offense History and Convictions

Shields has multiple prior criminal convictions involving sexual misconduct, which will be discussed chronologically.

In March 1988, Shields was arrested in Florida for making obscene phone calls in which he asked two boys to engage in oral sex. On May 10, 1988, he was convicted of this offense in Wakulla County, Florida and sentenced to six months of probation. (Ex. 40 (Chronology).)

Between January and September 1989, Shields committed a total of four sexual offenses; three of these offenses occurred in Maine, while the fourth was in Florida.

First, on January 9, 1989, when Shields was twenty-seven years old, he told a thirteen-year-old boy in Camden, Maine that he had lost his wallet and asked the boy for help finding it. Shields led the boy into an abandoned building and fondled his genitals. The boy resisted physically, at which point Shields fled. (Trial Tr. Day 4, 62–3 (Tomich).)

Second, on April 19, 1989, Shields committed an indecent assault on a nine-year-old boy in an elementary school bathroom in Florida. While in the bathroom, Shields asked the boy to pull down his pants so that Shields could see his "privates." (Trial Tr., Day 2, 108 (Plaud).) This event never resulted in an arrest or prosecution. However, Mr. Shields has admitted to the offense. (*Id.* at 107–08.)

Third, on July 15, 1989, Shields followed a fourteen-year-old boy into a school bathroom in Bath, Maine. Shields put the boy in a headlock, and told the boy to jerk him off. When the boy did as ordered, Shields ejaculated. He told the victim he would be back to get him if the boy came out of the bathroom in less than five minutes. (Ex. 10; Trial Tr. Day 4, 70–71 (Tomich).)

Less than two months later, on September 7, 1989, outside the same school in

The government did not specifically raise a dispute as to any particular facts contained within this personal history section, but has generally brought into question Mr. Shields' credibility as a self-reporter.

Bath, Maine, Shields approached a six-year-old boy who was looking for frogs. Suggesting that he knew another place to catch frogs, Shields persuaded the boy to go with him into the woods behind the school. There, Shields sexually assaulted the boy, sticking his finger in the boy's anus and fondling his genitals.[3] (Trial Tr. Day 4, 72 (Tomich).)

On September 14, 1989, Shields was arrested in Maine. (Exs. 11, 40.) When in custody, Mr. Shields was very distraught and anxious. He repeatedly stated that he was sick, needed help, and wanted to see his mother. Shields said, "I'm sick. It's not me that does these things." (Ex. 11.) Pointing to his head, Shields continued, "It's not me . . . it's another person." (*Id.*) Shields also stated that he wanted to go somewhere other than jail so that he could get help; Shields then asked, "Why don't they just put me in the hospital where I can get help?" and "Can I please just go home with my mother?" (*Id.*)

Discussing this string of offenses with Dr. Rypma, Mr. Shields described this as the period in his life when he did his heaviest drinking and drug use, and that he generally "blotted out" this period of time from his memory. (Trial Tr. Day 7, 56 (Rypma).)

On February 21, 1990, Shields pled guilty to the three sexual contact crimes which occurred in Maine. (Exs. 4, 5, 6,

40.) For the September 1989 offense against the six-year-old boy, Mr. Shields was sentenced to five years incarceration, with all but three and one half years suspended. (Ex. 6.) He was sentenced to consecutive or concurrent sentences on the other two offenses. Thus, Mr. Shields was incarcerated until January 1992. (Ex. 40.)

When he was released in January 1992, Mr. Shields began a term of probation that lasted until March 1996. (Ex. 40.) During this four-plus year period, there is no evidence that Mr. Shields violated any of his imposed conditions, which included, among other things, attendance in a three-year sex offender counseling program. While Mr. Shields apparently completed the program,[4] he has stated that he got very little out of this treatment. (Trial Tr. Day 7, 35–36 (Rypma).) Shields described the program to Dr. Rypma as consisting of group meetings for two hours per week with discussions about a variety of members' problems, not solely issues of sexuality or sexual deviance. (*Id.*)

Approximately two years after his probation ended, in March 1998, Shields engaged in unlawful sexual contact with a twelve-year-old boy. This offense involved a boy Shields knew. When interviewed about this offense by the court-appointed expert, Dr. Plaud, Shields stated that, over the course of several weeks, he and this boy (whom Shields inaccurately described

---

**3.** Additional details surrounding this event were discussed at trial. On cross-examination, Dr. Rypma stated that police records indicate that Shields pulled his own pants down during this incident and that Shields told the boy to stay in the woods until Shields left or else he would "get him." (Trial Tr. Day 7, 98–99 (Rypma).) As for Shields' self-report of this incident, he told Dr. Rypma that he did not have any real recollection of this incident, but at one point stated that he only touched the boy's buttocks. (*Id.* at 97–99.) Notably, when interviewed about his 1989 offenses by Drs. Plaud and Rypma, Shields

did not provide many details of the offenses, but did not deny committing them. He generally stated that if the records suggested he did something, he probably did. (*See, e.g.,* Trial Tr. Day 2, 77–78 (Plaud).)

**4.** No records of this treatment are available because the treatment provider had to close his practice due to illness. (Trial Tr. Day 6, 169–171 (Thomas).) Mr. Shields also reported this treatment to Dr. Graney. (Trial Tr. Day 6, 63 (Graney).)

as thirteen or fourteen years old) had engaged in mutual masturbation. Shields stated that he had paid the boy on each occasion. (Trial Tr. Day 2, 84 (Plaud).) When he spoke with Dr. Rypma about this incident, Shields denied touching the boy and described the boy as a male "prostitute." (Trial Tr. Day 7, 100 (Rypma).) However, the victim, a twelve-year-old transient living in a shelter, had reported to police that Shields touched him in the groin area, placing him in fear of being raped and leading the boy to run out of Shields' apartment. (Trial Tr. Day 7, 101–102 (Rypma).)

Shields pled guilty to this offense (one count of unlawful sexual contact) and was sentenced to a term of five years, though all but 112 days of confinement were suspended for a four-year period of probation with special conditions. (Exs. 7, 40.) Shields' probation required, among other things, that he register as a sex offender, avoid all contact with the victim or any children under the age of sixteen, and attend sex offender treatment.[5] (Exs. 7, 40.)

On this period of probation, Shields again attended sex offender treatment, this time with Dr. Kay Landry in Portland, Maine. As described by Shields, this treatment program entailed both individual and group elements and included a curriculum with homework assignments. Thus, unlike his first treatment experience, this program appears to have been of the cognitive behavioral model, a model which today is considered the leading approach in the field.[6] Treatment lasted roughly from late 1998 or early 1999 until 2001, although it is likely that Mr. Shields' participation was interrupted by periods of incarceration due to the probation violations detailed below. Nevertheless, in describing this program to Dr. Rypma, Shields stated that it was "more helpful" than his initial experience with treatment from 1993–1996. (Trial Tr. Day 7, 114–15 (Rypma).)

This time around, Shields was not fully compliant with his probation, and his probation was revoked two times. The first motion for probation revocation was filed in December 1998; Shields ultimately admitted to a violation, was sentenced to 125 days incarceration, and was incarcerated from approximately February 1999 until the beginning of June 1999. (Exs. 7, 40.) Second, in December 2000, a second motion for probation revocation was filed; Shields again admitted to the violation and this time was sentenced to eighteen months incarceration, which he served until the end of August 2001. (Exs. 7, 40.) While the nature of the probation violations are not entirely clear from the court records, the evidence suggests that the first violation involved Mr. Shields' having written many bad checks. The second violation stemmed from substance abuse (a failed urinalysis) and/or Shields' conviction

---

**5.** Sex offender treatment is not clearly listed as a special condition of probation. However, a subsequent entry on the docket record refers to the "sex offender and substance abuse programs specifically described prior." (Ex. 7 (Docket entry dated 3/19/99).) As Dr. Tomich stated at trial, this reference suggests that attendance in both types of treatment was mandatory for Mr. Shields. (Trial Tr. Day 4, 112–113 (Tomich).)

**6.** As with his first treatment program, records are not available for Mr. Shields' time in this treatment. Mr. Thomas, the sex offender treatment provider who contracts with U.S. Probation in Portland, testified that while Ms. Landry's program was cognitive behavioral therapy, programs have evolved substantially in the past eight years and the experience Mr. Shields would have in Mr. Thomas' program today would likely be much more intense and comprehensive. (Trial Tr. Day 6, 170–172 (Thomas).)

of larceny by deception for failing to return a rented computer.[7] There is, however, no evidence indicating that either violation involved sexual misconduct.

Just over a year after his release following the second probation violation, on September 18, 2002, Shields was arrested again when hundreds of images of adolescent and pre-adolescent children, mostly boys, engaged in sexually explicit conduct were found on a computer in his apartment. (Ex. 9.) This incident led both to a third probation revocation and an independent federal prosecution. At the state level, Shields admitted to the probation violation and was ordered to serve the remaining thirty-four months of his 1998 unlawful sexual contact sentence. (Ex. 7, 40.) In the federal prosecution, Shields pled guilty to possession of child pornography and was sentenced to fifty-seven months incarceration with three years of supervised release. (Exs. 8, 40.)

Shields began serving his federal sentence at the high security United States Penitentiary in Lewisberg, Maine. He was later transferred to the Federal Correctional Institution at Butner ("FCI–Butner") in North Carolina, where he remained until he was released to the Pharos House, a federal halfway house in Portland, Maine, to serve the final months of his sentence.

## C. Treatment at FCI–Butner

While incarcerated at FCI–Butner, Shields participated in therapy with Dr. Dawn Graney, a clinical psychologist with a specialty in forensic psychology. (Ex. 103 (Dr. Graney's Curriculum Vitae).) Over the course of approximately two years—from August 2004 to September 2006—Dr. Graney had about fifty individual counseling sessions with Shields, primarily focusing on his depression and personal history as a victim of sexual abuse.[8]

Dr. Graney reported that she and Shields developed a good rapport, and that Shields was generally forthcoming and genuine during their therapy sessions. (Trial Tr. Day 6, 54 (Graney); Ex. 103 (Termination Summary, Sept. 11, 2006).) Shields, according to Dr. Graney, made significant progress in managing his depression via medication and behavioral techniques, dealing with longstanding family and abuse issues, and improving his motivation and self-esteem. (Ex. 103 (Termination Summary, Sept. 11, 2006).) Reflecting on the two years she worked with Mr. Shields, Dr. Graney stated that she has "seen an essentially miserable individual with no real sense of value or future, develop into a man who has begun to identify significant goals for himself in life." (Ex. 103 (Letter to Probation Officer from Dr. Graney, Sept. 7, 2006).) In addition, Dr. Graney noted that Mr. Shields steadily progressed in his "willingness to open up to treatment." (Trial Tr. Day 6, 95 (Graney); *see also* Ex. 103 (Letter to Probation Officer from Dr. Graney, Sept. 7, 2006).) Outside of therapy, Shields was a leader in Alcoholics Anonymous, read self-help books, and participat-

---

7. While a conviction on this charge is not in evidence, Dr. Rypma testified that records indicate that, on March 1, 2001, Mr. Shields pled guilty to theft by deception. When interviewed by Dr. Rypma, however, Shields stated that the charges had been dismissed but the complaint itself had led to his revocation. (Trial Tr. Day 7, 109–10 (Rypma).)

8. Shields originally was seen for monthly monitoring due to his history of depression and suicide attempts. In addition to focusing on managing his depression and addressing his history of abuse, the therapy also addressed Shields' relationship difficulties, decision making, and release planning. (Ex. 103 (Termination Summary, 9/11/06); Trial Tr. Day 6, 19 (Graney).)

ed in other courses and programs offered by the Bureau of Prisons. (Trial Tr. Day 6, 35–36, 44–46 (Graney).)

Dr. Graney and Shields also spoke extensively about preparing for his release into the community. Dr. Graney noted that Shields initiated much of the release planning, almost a year in advance. Shields indicated to her that, in his past incarcerations, he had failed to properly prepare for release and had "messed up" as a result. (Trial Tr. Day 6, 51, 54 (Graney); *see also* Ex. 103 (5/4/06 treatment note) (Mr. Shields admitting to Dr. Graney that he had done little to prepare for his release from prison in 2002 but stating that, this time, he was "putting much effort into planning and preparing for release" and that, with a "new outlook,[he sees] an opportunity for positive change in his life").) By the time Shields left Butner to enter a halfway house (Pharos House), according to Dr. Graney, Shields had done the "most preparation" for release of any inmate she had worked with. (*Id.* at 48.) In her final treatment note ("Termination Summary") on the day of his transfer, Dr. Graney described Mr. Shields as "medication compliant with no depressive symptoms," and noted that he had "expressed dedication toward changing destructive patterns in his life." (Ex. 103 (Termination Summary, Sept. 11, 2006).)

In addition, Mr. Shields and Dr. Graney occasionally discussed his feelings about his history of sexual offending. At the beginning of his counseling relationship with Dr. Graney, Mr. Shields stated that he was "disturbed by his sexual offending." (Ex. 103 (8/19/04 treatment note).) Nearly two years later, as he was nearing the end of his time at FCI–Butner, Shields—referring to his multiple incarcerations for sex offenses—stated that he felt he had "wasted [his] life" and "become the person he despised." (Ex. 103 (6/14/06 treatment

note).) In this same session, Shields addressed his upcoming release and expressed a "desire to do things differently this time." (*Id.*) Shields also noted that, at this point in his life, he was "able to see the individuals he molested as victims, when he had been unable to do so before." (Ex. 103 (8/16/06 treatment note).)

Notably, though, Dr. Graney did not engage in any sex offender counseling or treatment with Mr. Shields, as there was, at the time, a separate sex offender treatment program at FCI–Butner. In fact, Mr. Shields had, at his request, been transferred from Lewisberg to FCI–Butner so that he could enroll in FCI–Butner's drug and sex offender treatment programs. (Trial Tr. Day 7, 123–24 (Rypma).) When he began his sessions with Dr. Graney, Mr. Shields was on the waiting list for the sex offender program. (Ex. 103 (8/19/04 treatment note).) However, in January 2005, Mr. Shields informed Dr. Graney that he had refused participation in the sex offender treatment program, telling her that he was not in the "right state of mind" for the program. (Ex. 103 (1/26/05 treatment note).) In her notes documenting this discussion with Mr. Shields, Dr. Graney wrote that Shields "expressed a recognition of the need for counseling, [but] he does not feel he would be able to fully participate in and benefit from the program at this time." (*Id.*) During this discussion, Dr. Graney acknowledged that Shields was entitled to refuse the program, but "strongly encouraged" him to enter a similar treatment program upon release; Dr. Graney noted that Shields "insisted he would do so." (*Id.*) At trial, Dr. Graney testified that, in her opinion, had Mr. Shields entered the sex offender treatment program at Butner at that time (January 2005), he would not have done well because his depression and low self-esteem "would have interfered with his ability to really successfully com-

plete the program." (Trial Tr. Day 6, 31–32 (Graney); *see also* Ex. 103 (Letter to Probation Officer from Dr. Graney, Sept. 7, 2006) ("I truly believe that had he entered the program at that time, he would have ultimately failed and not benefitted from the program as he was not in a place where he was ready to take part in that type of introspection and challenging.").)

Yet Dr. Graney does believe that sex offender treatment remains Shields' "primary treatment need" and that such therapy is of the "utmost importance." (Ex. 103 (Letter to Probation Officer from Dr. Graney, Sept. 7, 2006); (12/9/05 treatment note).) When working with Mr. Shields to prepare for his release, Dr. Graney repeatedly emphasized his need for sex offender treatment in a group setting upon release [9] and her records—and letter to Probation and future therapists—reflect her belief that Shields understood and accepted this need.[10]

## D. Shields at the Pharos House

On September 12, 2006, Shields was released from FCI–Butner in North Carolina to the Pharos House, a federal halfway house in Portland, Maine, to serve the final two months of his child pornography sentence.[11] Mr. Shields was to remain there for approximately two months; he was scheduled for release from the Pharos House (and BOP custody generally) on November 9, 2006, when he was slated to begin a mandated three-year period of supervised release. (Ex. 104 (Pharos House Terminal Report).) However, on November 2, 2006, U.S. Marshals removed Mr. Shields from the Pharos House and transferred him to FCI–Devens. (*Id.*) On November 8, 2006, one day before his scheduled release from federal custody, the BOP certified Shields as a "sexually dangerous person" under the Adam Walsh Act. (*See* Notice of Certification That Resp't is a Sexually Dangerous Person and Req. for Hr'g Pursuant to 18 U.S.C. 4248(a), Nov. 8, 2006) (Docket No. 1.)

Ms. Melissa Raenae Moore was Shields' case manager at Pharos House.[12] At trial, Ms. Moore testified that, while at Pharos House, Mr. Shields was highly prepared and motivated to succeed, and that he had followed all of the conditions and rules of the house. Specifically, Mr. Shields had registered as a sex offender, successfully attained and retained employment at a Holiday Inn restaurant, and attended Al-

9. In her December 9, 2005 treatment note, Dr. Graney wrote that Shields had asked for "her input as to what issues she believe[d] [were] most pertinent for him to address." (Ex. 103, (12/9/05 treatment note).) Her response: "His sexual offending was noted as being his primary treatment need, although he was reminded that this will need to be addressed in a group treatment setting following release. (He opted not to partake in the SOTP [Sex Offender Treatment Program]." (*Id.*)

10. On February 24, 2006, approximately six months prior to his scheduled release to the halfway house, Dr. Graney noted that Shields "recognizes the serious need to address his own sexual perpetration in a treatment program following release as he opted not to participate in the SOTP while incarcerated."

(Ex. 103 (2/24/06 treatment note).) In her letter to Probation documenting her treatment and observations of Mr. Shields, Dr. Graney stated that Shields "is aware of the need ... to commit himself fully to taking part in sex offender treatment." (Ex. 103 (Letter to Probation Officer from Dr. Graney, Sept. 7, 2006).)

11. While at Pharos House, Mr. Shields was still in federal custody. The placement is designed as a transition for inmates prior to release into the community at the end of their sentence of incarceration.

12. The "Terminal Report" authored by Ms. Moore detailing Mr. Shields' stay and removal from the Pharos House was admitted into evidence as Exhibit 104.

coholics Anonymous meetings regularly. (Trial Tr. Day 6, 105, 109, 112.) In addition, Mr. Shields attended two meetings of Sex and Love Addicts Anonymous. (*Id.* at 112–13.) As part of her duties at the Pharos House, Ms. Moore authorized and conducted "accountability checks" on residents in order to ensure that a resident was following his approved itinerary when he left the halfway house. (*Id.* at 106–08.) Ms. Moore indicated that, because Mr. Shields was the first sex offender she supervised, she authorized many accountability checks of him and, over the course of his two month stay, never received a report suggesting he had deviated at all from his approved itinerary. (*Id.* at 107.)

With respect to counseling, Ms. Moore stated that she had tried to arrange both sex offender treatment and general mental health counseling for Mr. Shields. However, in both instances, she was told that Mr. Shields could not enroll while still at Pharos House; the necessary referrals would only be available to Mr. Shields once his time at Pharos House ended and his three-year supervised release began. (*Id.* at 115–18.)

Finally, Ms. Moore testified that, in planning for his release from Pharos House, Mr. Shields had secured a place at a sober living house in the Portland area. (*Id.* at 119–20.) However, as noted above, Mr. Shields was removed from Pharos House by U.S. Marshals before he could complete the transition to the sober living house.

## E. Post–Release Conditions and Requirements

As part of his federal sentence from his child pornography conviction, if Mr. Shields is released, he is subject to a three-year term of supervised release. (Ex. 8.) In addition to a series of standard conditions of supervision (e.g., restrictions on one's movement, reporting requirements, etc.), Mr. Shields is subject to several special conditions imposed by the sentencing court. (*Id.*) Specifically, Mr. Shields will be required to participate in mental health, sexual offender, and substance abuse treatment, as well as submit to searches of his home and any computer equipment by the U.S. Probation office. (*Id.*) At the hearing, Mr. Daniel Kelly, who would have been (and presumably still would be) the probation officer assigned to Mr. Shields were he to be released, testified to the strict terms of supervision. In particular, Mr. Kelly noted that, in a case like Mr. Shields', he would seek modifications to the conditions in order to incorporate technologies such as GPS and devices which track internet activity on computers. (Trial Tr. Day 6, 144–45 (Kelly).)

Detective Kelly Gorham, a police detective in Portland, Maine responsible for registering, monitoring, and maintaining the city's sex offender registry, testified about the requirements which state law imposes on Mr. Shields, a lifetime sex offender registrant. (Trial Tr. 6, 186 (Gorham).) In addition to contacting the police within twenty-four hours of his release from custody, Mr. Shields would have to meet with Ms. Kelly every ninety days and would be subject to random residency checks by the police. (*Id.* at 186–90 (Gorham).)

As to the sexual offender treatment Mr. Shields would receive on supervised release, Mr. Stephen Thomas—the director of the program Mr. Shields would attend—described his regimen as "very rigorous," arguably the "strictest in the state." (Trial Tr. Day 6, 160, 171 (Thomas).) Thomas employs a "cognitive behavioral" model of treatment; this model is premised on the notion that people think before they act. Thus, in a cognitive behavioral treatment program, a counselor seeks to help an

offender understand the risk factors and "benchmarks" associated with his offending so that, when confronting a risky situation, he can stop himself before harming another. (*Id.* at 166–67.) Thomas explains that participants face intense supervision, significant restrictions on movement and activities, and periodic polygraph examinations. (*Id.* at 160.) There are three key components to his treatment team: the treatment providers, the probation officer, and the polygraph examiner. (*Id.* at 159.) There is routine communication between all members of the team, and communication is increased when any red flags, such as a failed polygraph examination, arise. (*Id.* at 163–64.)

## III. DISCUSSION

The Act provides for the civil commitment of "sexually dangerous person[s]." *See* 18 U.S.C. § 4248. Under 18 U.S.C. § 4247(a)(5), a "sexually dangerous person" is one "who has engaged or attempted to engage in sexually violent conduct or child molestation and who is sexually dangerous to others." A person is "sexually dangerous to others" if he "suffers from a serious mental illness, abnormality, or disorder as a result of which he would have serious difficulty in refraining from sexually violent conduct or child molestation if released." 18 U.S.C. § 4247(a)(6). Thus, to commit an individual under the Act, it first must be established that the person "has engaged or attempted to engage in sexually violent conduct or child molestation." 18 U.S.C. § 4247(a)(5). This must be proven beyond a reasonable doubt. *United States v. Shields,* 522 F.Supp.2d 317, 330 (D.Mass.2007) (holding that due process requires a reasonable doubt standard to the "backward-looking factual finding" required for civil commitment under the Act). If this threshold prong is established, the court then must decide if the person has a "serious mental illness, ab-

normality, or disorder as a result of which he would have serious difficulty in refraining from sexually violent conduct or child molestation if released." 18 U.S.C. § 4247(a)(6); *see Kansas v. Crane,* 534 U.S. 407, 413, 122 S.Ct. 867, 151 L.Ed.2d 856 (2002) (holding that proof of "serious difficulty in controlling behavior" is a necessity for commitment). This must be proven by clear and convincing evidence. 18 U.S.C. § 4248(d); *Shields,* 522 F.Supp.2d at 330 (holding that a " 'clear and convincing' standard for the forward-looking determination as to whether a person is "sexually dangerous to others" is constitutionally sufficient").

Thus, in order to prove that Mr. Shields is a "sexually dangerous person," the government must prove three elements: (1) that Mr. Shields engaged in or attempted to engage in sexually violent conduct or child molestation; (2) that Mr. Shields suffers from a serious mental illness, abnormality, or disorder; and (3) that, as a result of the serious mental illness, abnormality, or disorder, Mr. Shields would have serious difficulty in refraining from sexually violent conduct or child molestation if he were to be released. *See* 18 U.S.C. § 4247(a)(5)-(6); 18 U.S.C. § 4248.

### A. The First Element: Child Molestation

As both sides agree, the government has proven beyond a reasonable doubt that Shields engaged in child molestation in the past.

### B. The Second Element: Serious Mental Disorder

■ All three experts (Drs. Plaud, Tomich, and Rypma) diagnosed Shields with pedophilia, which they all agreed was a serious mental disorder. According to Dr. Plaud, the complete diagnosis is pedophilia, sexually attracted to males, nonexclu-

sive type.[13] (Trial Tr. Day 2, 98, 109 (Plaud).) Each expert based his diagnosis on the diagnostic criteria in the *Diagnostic and Statistical Manual of Mental Disorders,* Fourth Edition, Text Revision ("DSM–IV–TR"). Under the DSM–IV–TR the diagnostic criteria for pedophilia are:

A. Over a period of at least 6 months, recurrent, intense sexually arousing fantasies, sexual urges, or behaviors involving sexual activity with a prepubescent child or children (generally age 13 or younger).

B. The person has acted on these sexual urges, or the sexual urges or fantasies cause marked distress or interpersonal difficulty.

C. The person is at least age 16 years and at least 5 years older than the child or children in Criterion A.

(Ex. 22A.) Of Shields' multiple offenses, three contribute directly to the diagnosis: (1) the April 1989 offense against a nine-year-old boy; (2) the September 1989 offense against a six-year-old boy; and (3) the 2002 child pornography offense.[14] It is clear that the offenses against the six and nine-year-old boys establish that Shields has "acted on [his] sexual urges" and en-

gaged in "behaviors involving sexual activity with a prepubescent child." (Ex. 22A.) However, because these incidents occurred within six months of each other, the presence of the child pornography offense eight years later is what renders the first criteria satisfied. (Trial Tr. Day 2, 100–05 (Plaud).) Child pornography is a "significant diagnostic indicator of pedophilia" and suggests that Mr. Shields' sexual attraction to prepubescent children has persisted, at least into 2002. (*Id.* at 109.) While Respondent suggests that there is no evidence that Shields has current deviant sexual urges, the DSMIV–TR states that pedophilia is "usually chronic, especially in those attracted to males," (Ex. 22A),[15] and none of the experts suggested that there was evidence indicating that Shields no longer met the diagnostic criteria.[16]

Accordingly, as the advisory jury found, this Court concludes that the government has met its burden of proving the second element under the Act by clear and convincing evidence.

**C. The Third Element: Serious Difficulty Refraining**

■ The real point of dispute involves the third element, whether the govern-

---

13. In the context of this diagnosis, "nonexclusive type" means that the diagnosed individual is capable of having sexual relations with people other than prepubsecents—that is, they are capable of having sexual relations with adults. (Trial Tr. Day 3, 121 (Plaud).)

14. While the offenses against the twelve and thirteen-year-old boys may also satisfy the first criteria, Dr. Plaud deemed the 1998 offense against the twelve-year-old a "borderline case" and one which he would not base a pedophilia diagnosis upon. (Trial Tr. Day 2, 108 (Plaud).) Dr. Plaud explained that because children mature sexually at different rates, offenses against children aged eleven or older must be considered on a case-by-case basis to determine whether they properly contribute to a diagnosis of pedophilia. (*Id.* at 101–03.) Thus, Shields' diagnosis of pedophi-

lia does not directly rest on these offenses, although they were considered as additional pieces of information that are consistent with the diagnosis. (*Id.* at 102.)

15. That the DSM–IV states that pedophilia is "usually chronic" should not be mistaken as addressing the separate question of whether an individual can be "cured" of pedophilia.

16. Dr. Rypma does contend that the 2002 child pornography offense does not constitute evidence of current deviance, as he credits Shields' assertion that he was really looking for "younger-looking men." (Trial Tr. Day 7, 70–71 (Rypma).) However, Dr. Rypma did rely, albeit "cautiously," on the child pornography offense in making his diagnosis of pedophilia. (*Id.*)

ment has proven by clear and convincing evidence that Mr. Shields would have serious difficulty refraining from future acts of child molestation as a result of his mental disorder if released.

I find that the government has met its burden. In reaching this determination, I rely most significantly on Shields' own past conduct which demonstrates that he has had serious difficulty in refraining from child molestation even after he had received sex offender treatment twice in the past. I also rely heavily on the opinion of Dr. Plaud, the court appointed expert in this case.

### 1. Shields' Past Treatment & Recidivism

From 1993 to 1996, Shields was in a sex offender treatment program, yet he molested a twelve-year-old in 1998. Far from showing remorse, he excused his conduct at the time by calling the twelve-year-old boy a prostitute. Mr. Shields then attended a second sex offender treatment program from approximately 1999 to 2001, one which he described as "more helpful" for him than the first. (Trial Tr. Day 7, 114–15 (Rypma).) However, in 2002, Mr. Shields pled guilty to unlawfully possessing pictures of prepubescent children. While this was not a contact crime like many of his previous offenses, it does suggest that despite two different attempts at treatment for a total of five years, Mr. Shields was still acting on his attraction to pre-pubescent boys. Moreover, as Dr. Rypma conceded at trial, there is research suggesting that persons with a history of contact sexual offenses and a subsequent child pornography offense are at an increased risk of recidivism.[17] (Trial Tr. Day 7, 113; Day 8, 34–35 (Rypma).)

---

17. On re-direct, Dr. Rypma explained that this was one study (Seto 2005) with a small sample size.

Significantly, this Court does not have any evidence of positive progress by Mr. Shields in a sex offender treatment program. That Mr. Shields responded well to treatment with Dr. Graney gives this Court hope that sex offender treatment can be effective for Mr. Shields despite the failure of the last two programs to curb his conduct. As several witnesses testified at trial, sex offender treatment programs have evolved substantially since Shields' earlier attempts, and it is possible that Shields' present openness to treatment and the newly developed treatment models will combine to yield positive results. However, this Court cannot ignore Mr. Shields' proven track record of recidivism even after treatment. Moreover, this Court cannot rely solely on Mr. Shields' promise to engage seriously in future sex offender treatment when released.

### 2. Dr. Plaud's Opinion

In addition to Respondent's history of recidivism despite sex offender treatment, I also rely on the testimony of Dr. Plaud, the court-appointed expert. Dr. Plaud has over twenty years of professional experience in the field of sex offender evaluation and treatment. Dr. Plaud was appointed by this Court with the approval of both parties. He has conducted risk assessments of over one thousand sex offenders and has testified in Massachusetts courts, and the courts of at least eleven other states, as an expert in the field of sex offender risk assessment on well over one hundred occasions. Prior to this case, Dr. Plaud worked exclusively on behalf of respondents (persons facing civil commitment as sexually dangerous persons), and has never before testified in court that an individual was sexually dangerous. Dr.

Plaud serves on several editorial boards and as a reviewer for several publications in psychology and psychiatry, has started an online journal devoted to the issue of civil commitment of sexually dangerous persons, and has published several articles on sexual behavior and sexual offending. (*See* Ex. 1 (Plaud Curriculum Vitae).) Dr. Plaud conducted two clinical interviews of Shields, first in November 2007 and again, after receiving new documents, in March 2008.

Testifying at trial, Dr. Plaud was asked whether he believed that Mr. Shields met the definition of a sexually dangerous person as defined under the Adam Walsh Act. Dr. Plaud responded with what he called "a very uneasy 'yes.'" (Trial Tr. Day 2, 131 (Plaud).) Careful to state that he was not convinced that Mr. Shields would re-offend, Dr. Plaud conceded that he "believe[d] there is a risk" associated with Mr. Shields, (*id.* at 130), and, given the statute's criteria, he was "unable in totality to say that [Shields] would not meet those criteria." (*Id.* at 65.)

### a. Methods for Assessing Risk: Actuarial Tools

It is necessary to discuss the methods and tools used by professionals engaged in the practice of assessing the recidivism risk of sex offenders. As is the commonly accepted practice in the field, all three experts in this case used an actuarial tool as part of his evaluation process. Each characterized his methodology as an "adjusted actuarial approach," explaining that he computes an actuarial tool in order to get a "baseline" suggestion of risk and then looks for other factors that research has shown may or may not be predictive of risk. Actuarial tools are, at best, "moderate predictor[s] of risk," and do not enable even experts in the field like Drs. Plaud, Rypma, and Tomich to predict the future (i.e., whether Mr. Shields will or will not re-offend in the future). (Trial Tr. Day 2, 68, 72, 134 (Plaud).) The tools, however, do provide a "greater than chance prediction" (*id.* at 69, 72) and thus allow evaluators to initiate an analysis by placing an individual in a range (e.g., high, moderate, or low risk).[18] The evaluator can then deviate from the actuarial tool's prediction if he identifies particular factors that suggest the presence of an increased or decreased risk of recidivism for that individual. (*Id.* at 72.)

In this case, Dr. Plaud's actuarial instrument of choice was the Rapid Risk Assessment For Sexual Offense Recidivism, or

---

**18.** On November 26 and 27, 2007, this Court held an evidentiary hearing on Mr. Shields' motion to exclude the government's expert testimony in this case. Two psychologists, Dr. Tomich and Dr. Kriegman, testified concerning the science of risk prediction. This Court also reviewed an affidavit filed by Dr. Kriegman discussing the development of actuarial instruments for risk prediction applications and the limitations of those instruments. This Court held that "actuarial risk assessments (RRASOR, STATIC–99, and any adjusted actuarial approach, including the "guided clinical method" and the "adjusted actuarial method") are reliable under the standards set forth in *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)." *United States v.*

*Shields*, No. 07–12056–PBS, 2008 WL 544940, at *1 (D.Mass. Feb. 26, 2008). This ruling was limited to the admissibility of the actuarial tools and subsequent testimony about them at trial; it did not speak to the weight this Court should ultimately give such tools in determining whether Mr. Shields should be committed under the Act.

While I have considered Mr. Shields' scores on the actuarial instruments, these scores are not the primary basis upon which I rest my conclusion of sexual dangerousness. In fact, I afforded them little weight in my final analysis. Rather, as detailed above, I focused on Mr. Shields' past conduct, lack of successful sex offender treatment to date, and the testimony of the experts *as a whole* (not simply their predictions based on the actuarial tools).

"RRASOR," a predictive tool validated by peer-reviewed literature. Under the RRASOR's scoring system, Shields received five points, out of a possible score of six. (Ex. 26.) Shields received three points because he had at least four prior sex offense convictions (not including the child pornography "index" offense), one point because he offended against male victims, and one point because the victims were not related to him. (*Id.*) In the studies underlying the development of the RRASOR, 52 out of 2,592 subjects scored a five (no subjects scored a six), and 49.8 percent of those 52 offenders re-offended within a five-year period. (Ex. 27.) Because the underlying studies did not each contain ten-year data, the RRASOR's developers used mathematical models to extrapolate a ten-year prediction from the five-year data.[19] For a score of five, the extrapolated recidivism rate was 73.1 percent over ten years. (Ex. 27.)

Rather than using the RRASOR, the two other experts (Drs. Tomich and Rypma) scored Shields on the Static–99, a different actuarial instrument used regularly in the field. Developed subsequent to the RRASOR, the Static–99 consists of ten items (compared to the RRASOR's four), but is based overall on a smaller sample size of 1,301 sexual offenders. While the STATIC–99 has become the "most utilized" actuarial tool, both the RRASOR and Static–99 are generally accepted tools within the field.[20] (Trial Tr. Day 2, 135 (Plaud); Day 3, 51 (Plaud)); *see Shields*, 2008 WL 544940, at *1.

Both Dr. Tomich and Dr. Rypma assigned Shields a score of eight (out of a possible twelve) on the Static–99, placing him in the "high risk" category (a category applying to any score of six or above). Individuals in this category have, on average, been found to re-offend (based on re-conviction rates) at 39 percent over five years, 45 percent over ten years, and 52 percent over fifteen years. (Ex. 35.)

Notably, on both actuarial instruments, Mr. Shields scored within the highest risk category available. It is critical, however, to remember that the recidivism estimates generated by both the Static–99 and the RRASOR are group estimates based upon re-convictions and thus do not directly correspond to the recidivism risk of an individual offender. An offender's risk may be higher or lower based on other factors not adequately measured (or measured at all) by the actuarial instrument. Thus, each expert also investigated whether any other factors, known to be predictive of future risk, offered any insight into Mr. Shields' present dangerousness and risk of re-offending.

### 3. The Dynamic Factors

As all three experts acknowledged (and research has established), age can be a risk-reducing "protective" factor. It is generally accepted that younger offenders recidivate at higher rates than older offenders, with offenders aged fifty or above re-offending at about half the rate of younger offenders. (Trial Tr. Day 3, 69–70 (Plaud).) Moreover, a study conducted by the Static–99's creator has demonstrated that older offenders had lower sexual recidivism rates than would be expected based on their Static–99 scores. The study reported that, for offenders who, like

**19.** Dr. Plaud stated that both the five and ten-year figures of the RRASOR have been validated in independent, peer-reviewed studies and are generally accepted as reliable in the field of risk prediction. (Trial Tr. Day 3, 87–90 (Plaud).)

**20.** Dr. Rypma, however, suggested that the development of the Static–99 rendered the RRASOR "obsolete." (Trial Tr. Day 7, 66 (Rypma).)

Shields, scored in the "high risk" range and were between forty and forty-nine years old at release, the age-adjusted recidivism base rate was 25.7 percent at five years post-release (as opposed to the 39 percent rate reported in the standard Static–99 figures).[21] The recidivism rate of extra-familial child molesters, however, generally remains higher over the life of an offender when compared to rapists and intrafamilial child molesters; the rate for extra-familial child molesters does not dip below either of these comparators until offenders are aged fifty or above. (Ex. 32; Trial Tr. Day 3, 72 (Plaud).)

While Dr. Plaud noted that, at age forty-seven, Mr. Shields is "starting to be in that age range that statistics show is associated with less sexual offense recidivism," he concluded that Mr. Shields is "not quite there yet" and thus, age does not yet serve as a protective factor in this case. (Trial Tr. Day 2, 127 (Plaud); see also Trial Tr. Day 3, 144 (Plaud) ("If we were sitting here five years from now, my opinion may have been different. I just think he's not quite there yet agewise.").) Dr. Plaud held fast to this conclusion even after considering that, if released, Mr. Shields would be subject to a three-year period of probation. (Trial Tr. Day 2, 129 (Plaud).)

Like Dr. Plaud, Dr. Tomich testified that while he considered Mr. Shields' age as a possible protective factor, he determined that, given Mr. Shields is in his late forties (as opposed to his sixties) and that his child pornography offense occurred at age forty-one, there was not sufficient evidence to warrant a reduction of risk based on age in this case. (Trial Tr. Day 4, 122–23 (Tomich).) In contrast, Dr. Rypma concluded that Mr. Shields' age was a protective factor. Dr. Rypma spoke generally about the research demonstrating a decline in recidivism rates as an offender ages, with a precipitous decline after age fifty; he noted that Mr. Shields was "getting to a point where his sexual interests are different now." (Trial Tr. Day 7, 50, 82–83 (Rypma).) Thus there is disagreement among the experts as to whether Shields' age significantly protects against recidivism in this case.

Next, Dr. Plaud examined Mr. Shields' treatment history, because "participation and compliance with treatment would serve as a protective factor, a risk-reducing factor." (Trial Tr. Day 2, 127 (Plaud).) Noting that Shields has, in the past, relapsed even after treatment, Dr. Plaud concluded that Shields' past treatment also did not qualify as a risk reducer in this case. (Id. at 128.)

Finally, Dr. Plaud explained that Shields' most recent child pornography offense not only stands as evidence of an ongoing sexual deviance (the third of the "big three" factors), but also has, in some studies, been shown to be associated with increased recidivism. (Id. at 127.) Disagreeing, Dr. Rypma did not view the child pornography as "good evidence" of a continued sexual deviancy in Mr. Shields because, in his view, it was not clear that Mr. Shields was looking for children when searching the Internet. (Trial Tr. Day 7, 69–70 (Rypma).)

In the end, Dr. Plaud concluded that there was nothing that allowed him to opine that Mr. Shields' risk would be reduced below that suggested by the actuarial tool and his past offense history. (Trial Tr. Day 2, 128 (Plaud).)

Dr. Rypma, however, rendered a different opinion. In his view, the evidence as a

---

21. Respondent Shields previously submitted this study to this Court as part of the briefing associated with his motion to exclude expert testimony under Daubert. (See Def.'s Post-Daubert Hearing Br., Ex. G) (Docket No. 82.)

whole does not paint a portrait of a man who, at this point in time, has serious difficulty controlling his sexual behavior. (Trial Tr. Day 7, 81 (Rypma).) Dr. Rypma focuses on what he views as a progressive decline in signs of impulsive behavior and offenses over the course of Mr. Shields' life, describing the child pornography offense, for example, as "qualitatively much different" than the string of offenses Shields committed against strangers in 1989. (*Id.*) Dr. Rypma also testified that, while incarcerated, Mr. Shields has not engaged in any behaviors often associated with "compulsive pedophiles"; that is, Mr. Shields has not dressed like a child, collected pictures of children from magazines, or acted out sexually in any way. (*Id.* at 31–32.) Finally, Dr. Rypma gave considerable weight to evidence suggesting that Mr. Shields has changed and, in his view, is "an individual who is very engaged in the whole concept of change." (*Id.* at 82.)

While the Court agrees with Dr. Rypma that Mr. Shields has shown signs of being willing to change by seriously engaging in treatment with Dr. Graney and demonstrating a commitment to a sober lifestyle,[22] the bottom line is that Shields has never seriously engaged in sex offender treatment despite three opportunities. Dr. Rypma does not persuasively address this pattern of recidivism and treatment failure. In light of his serious offense history, with untreated pedophilia, Shields will have serious difficulty refraining from child molestation if released at this point in time. As Dr. Plaud made clear, the analysis in this case could be very different in just a short period of time. Demonstrated progress in a sexual offender treatment program, coupled with Mr. Shields' ad-

vancement in age, could very well alter the ultimate balancing in a future evaluation. However, at this point in time, the government has demonstrated by clear and convincing evidence that Mr. Shields will have serious difficulty in refraining from future acts of child molestation if released into the community.

### D. Commitment Pursuant to Section 4248

Once a court has found by clear and convincing evidence that an individual is a sexually dangerous person, the court must commit the individual to the custody of the Attorney General. 18 U.S.C. § 4248(d). The Act outlines specific obligations that the Attorney General has regarding the custody, care, and treatment of the committed person. First, the Attorney General "shall make all reasonable efforts" to cause the state where the person is domiciled or was tried to assume responsibility for the custody, care, and treatment of the committed person. 18 U.S.C. § 4248(d). "If, notwithstanding such efforts, neither . . . State will assume such responsibility, the Attorney General shall place the person for treatment in a suitable facility." 18 U.S.C. § 4248(d).

Before placing the person in a particular facility, the Attorney General must "consider the suitability of the facility's rehabilitation programs in meeting the needs of the person." 18 U.S.C. § 4247(i)(C). The Attorney General must also consult with the Secretary of the Department of Health and Human Services regarding the "establishment of standards for facilities used" for commitments pursuant to the Act, as well as the "general implementation" of

---

**22.** Mr. Shields has himself written the court about his intention to seek treatment and, in an affidavit, agreed to an extra year of supervised release to complete treatment (Mr. Thomas' treatment program typically takes two to four years; Mr. Shields sentence currently requires three years of supervised release.). However, neither the post-trial letter nor the affidavit is evidence in this proceeding.

the Act's provisions. 18 U.S.C. § 4247(i)(D).

The director of the facility in which a person is committed under the Act also has several responsibilities under the statute. First, the director is required to inform the committed person of "any rehabilitation programs that are available." 18 U.S.C. § 4247(e)(2). In addition, the director must provide the committing court with "annual reports concerning the mental condition of the person and containing recommendations concerning the need for his continued commitment." 18 U.S.C. § 4247(e)(1)(B) (stating that the committing court may also order copies of the report to be submitted to other persons).

Once committed to a facility by the Attorney General, the person is to remain in that facility until a State assumes responsibility for his custody, care, and treatment, or "the person's condition is such that he is no longer sexually dangerous to others, or will not be sexually dangerous to others if released under a prescribed regimen of medical, psychiatric, or psychological care or treatment; whichever is earlier." 18 U.S.C. § 4248(d). However, if, at any time, the director of the facility determines that the person satisfies this latter criteria, he "shall promptly file a certificate to that effect" with the committing court; the court must then either order the discharge of the person or hold a hearing to determine whether the person should be released. 18 U.S.C. § 4248(e).

In addition, the committed person may, via counsel or legal guardian, file a motion for a hearing to determine whether [he] should be discharged from the facility. 18 U.S.C. § 4247(h). The committed person may make such a motion at any time, so long as it is not within 180 days of a court determination that he remain committed. 18 U.S.C. § 4247(h).

## ORDER

The Court ORDERS:

(1) Respondent Shields shall be civilly committed as a sexually dangerous person to the custody of the Attorney General pursuant to 18 U.S.C. § 4248(d); and

(2) The Attorney General, within thirty (30) days of this ORDER, shall file a certificate with this Court stating whether a State has agreed to assume responsibility for Respondent Shields' custody, care, and treatment. If no State has agreed to assume responsibility by that date, the certificate shall detail all efforts the Attorney General has made to cause a State to assume such responsibility and shall identify the facility in which the Attorney General plans to place Respondent Shields. The certificate shall also explain why the facility is "suitable" for Respondent Shields, particularly with respect to the suitability of the facility's rehabilitation programs for meeting the needs of Respondent Shields; and

(3) Sexual offender treatment shall be offered to Respondent and shall be ready to commence within thirty (30) days of this ORDER, and an affidavit shall be filed by the director of the facility documenting the program; and

(4) The annual report required under 18 U.S.C. § 4247(e)(1)(B) shall be filed with this Court, with copies provided to Respondent Shields and his counsel, by February 16, 2010.